## JOHN BREEN *v.* CHARLES SCHMIDT.

Where the purchaser at auction of real property deposits the price with the notary before the act of sale is completed, the money so deposited is at the risk of the purchaser. C. P. 407. C. C. 2163.

But if the vendor consents to consider the money so deposited as a payment, it is at his risk.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. *Wolfe* and *Singleton*, for plaintiff, contended: The counsel for the defendant asks "to whom did this money belong after it had been deposited ; to *Breen* or to *Schmidt?*" Let his own client answer. Is his client in the habit of taking

money that don't belong to him? Is he in the habit of calling on notaries to get the money deposited with them to pay his notes when they fall due? Why did he call on the notary for this money? Let him speak for himself. He knew he had sold the property; he knew *Breen* had purchased it; he also knew that *Breen* had deposited the cash payment with the notary, with his consent and for his benefit; and yet he modestly enough, in the face of his own default and with the property incumbered with mortgages, wishes to take the money out of the hands of the notary. What would be thought of a notary who would pay money to a vendor who had neither completed his title nor signed the act? And yet the counsel, with scarce less modesty than his client, attempts to use this fact as an argument against the plaintiff; for, says he, "besides the refusal to give him *(Schmidt)* any part of the money, clearly shows that the deposit was not held for the benefit of *Schmidt*, and consequently not at his risk." The duty of *Breen* was plain, to wit, to deposit with the notary the cash paymebt, to furnish his notes and sign the act, all of which he faithfully did. The duty of *Schmidt* was equally plain, to wit, to transfer the property unincumbered and sign the act of sale. Neither of which requirements did he comply with. All of this controversy has grown out of *Schmidt's* own default and acts. He selected his auctioneer; he selected his notary; he failed to complete his title, and has not offered to complete it to this day; and he assented to the cash payment being deposited with the notary. Now, at the time of the conversation spoken of in *Latham's* testimony, the money had not been deposited with the notary. *Breen* and *Latham* were both pressing *Schmidt* to complete his title; and *Breen* put the question direct to *Schmidt* "to whom shall I pay this money, to you or who?" *Schmidt* answered him, and said "it made no difference whether he paid it to him or to the notary." Now *Schmidt*, knowing that he had not completed his title, had not the assurance to ask him directly to pay it to him, but he certainly did give him the option of paying it to the notary; and to make it perfectly conclusive that *Schmidt* meant that it should be deposited with the notary for his account, as soon as he found out that *Breen* had handed the money to the notary, he went to him and demanded a portion of it to meet a note falling due that day; which the notary prudently declined.

The counsel for the defendant says: "There can be no difference of opinion as to the rule of law on the subject; that art. 2134, C. C., provides, 'the payment must be made to the creditor, or to some person having a power from him to receive it,'" &c. We do not differ with the gentleman as to the law; but he will pardon us if we draw conclusions different from his own in applying the law to this case. We think that the notary in this case had authority from *Schmidt* to receive the money; and if he had not authority to receive it, *Schmidt* ratified the payment to him by demanding it as his own after it had been paid.

The counsel's professional sensibilities appear to be painfully shocked by the unscientific expressions of *Latham*. That a notary's clerk should not be technically correct in expressing himself in legal phraseology is not very wonderful. But let us see, after all, whether he is not more correct than the defendant's counsel. The notary was unquestionably, in this case, of the defendant's own selection, because it was advertised in the newspapers, of which the defendant must have had notice, and was followed up by the business of recalling the act being entrusted to him. Now, what had the notary a right to demand from the vendee? Why, that he should furnish his cash payment, give his note and sign the act. The furnishing the cash did not constitute the payment, nor his giving his notes; neither did his signing the act, but all three together. The art. 2127, C. C., defines what a payment is, to wit, "by payment is meant not only the delivery of a sum of money, when such is the obligation of the contract, but the performance of that which the parties respectively undertook, whether it be to give or to do."

It is contended, however, that the argument in regard to the payment is all wrong, "but it is obvious that the true point of view to be taken of the case does not present a question of payment, but of deposit." Let us see whether the gentleman is more fortunate in his understanding of the contract of deposit. Again, we refer to the code, art. 2897 says, "A deposit in general is an act by which a person receives the property of another, binding himself to preserve it and return it in kind." Now, will it be seriously contended that the notary received this money, binding himself to preserve it and return it in kind? Moreover, a deposit is essentially gratuitous, and we all know that notaries charge for their services in passing acts of sale.

We respectfully call the attention of the court to the item of damages, and ask that this item be increased to $100, and that the costs of the appeal fall on the defendant. The testimony on this point contemplates that the attorney's fee should be raised to $100 in the event of an appeal; and as the defendant has taken an appeal, we think it but right that he should pay the damages assessed by his own witness.

*C. Roselius*, for defendant, contended: The functions and authority of a notary public are defined by law; and, surely no one ever supposed that the public officer whose duty it is to draw up in the form, and with the solemnities pointed out by law, a deed, as authentic evidence of a contract of sale, was authorized to receive the price; and that such payment discharged the purchaser. Has the official character of the notary any relation to, or connection with, an agency to receive the payment of a debt due to either of the parties for whom he acts as scribe, *(escribano,)* for the purpose of affording clear and conclusive proof of their contracts? Does the circumstance that the debt, which it is pretended has been paid to the notary, arose out of the contract of sale evidenced by an act passed before him, give validity to the payment? All these questions must necessarily be answered in the negative.

There can be no difference of opinion as to the rule of law on the subject. Art. 2136 of the Louisiana Code provides : "The payment must be made to the creditor, or to some person having a power from him to receive it, or authorized by a court, or by law to receive it for him. Payment made to a person not having power to receive it for the creditor, is valid if the creditor has ratified it, or has profited by it." Or, in the language of Marcadé, in his commentary on the corresponding article of the Napoleon Code, 1239: " Le paiement doit se faire au créancier capable de recevoir, ou à quelqu'un qui le représente en vertu d'un mandat, soit conventionnel, soit judiciaire, soit légal." Vol. 4, 618.

Now, as the notary is not the mandatory of the vendor for whom he draws up and passes a deed of sale, it would seem to follow as a necessary consequence, that the purchaser cannot make a valid payment of the price to him.

Thus far I have endeavored to meet the counsel for the plaintiff on their own ground, as if the rights of the parties depend on a question of payment. But it is obvious, that the true point of view to be taken of the case does not present a question of payment, but of deposit. It is not true that *Breen* ever paid the cash portion of the price of the property he purchased to the notary or his clerk. That it was a deposit and not a payment is clear from the fact, that the day after the deposit had been made he had an unquestionable right to withdraw it, which, of course, he could not have done if the money had been paid. Perhaps it will be said that I take for granted the very question in dispute. Not so. What could have prevented *Breen* from withdrawing the money from the office of the notary? He was not bound to pay one cent of the price until *Schmidt* had executed an unincumbered title to the property which was the object of the sale. Did he intend to pay by anticipation? If such had been his intention he would have assented to the proposition of *Schmidt*, to pass the sale and to pay the price, and to rely upon the vendor's promise to raise the mortgage by which the property was incumbered. It was then a voluntary deposit of a sum of money made by *Breen* in the hands of a notary or of his clerk, for a special purpose. To whom did this money belong after it had thus been deposited, to *Breen* or to *Schmidt?* I have already shown that it was subject to the control of *Breen ;* that he retained the title to it; and that the maxim, *res perit domino,* would have applied if the funds had been destroyed. Is the rule different with regard to the loss resulting from the unfaithfulness of the depositary? I confess that I know of no legal principle countenancing any such difference.

But it is urged that *Schmidt* assented that the money should be deposited with the notary. Let us first refer to the testimony by which this position is sought to be supported.

*Latham*, in his testimony, says : " Witness went to *Mr. Schmidt's* store to get his title, and met *Mr. Breen* there, and found him conversing with *Mr. Schmidt* in relation to a change in the terms of the sale ; and in the course of the conversation *Mr. Breen* said to *Mr. Schmidt* ' to whom shall I pay this money, to you or who?' Witness observed that it was customary to pay it in the office. *Mr. Schmidt* said that it made no difference."

*J. D. French*, a witness for the defendant, gives a somewhat different version of this conversation. He says, " that he was present at the time of the conver-

sation between *Mr. Breen* and *Mr. Schmidt*, above alluded to by *Mr. Latham*, about the first of March—it might have been fifteen days earlier or fifteen days after. *Mr. Schmidt* and *Mr. Breen* were discussing the terms of the sale of property in Lafayette, and there being a calculation of interest to be made, *Mr. Schmidt* asked witness to assist him, or to make the calculation. *Mr. Latham* happened then to come in. When *Mr. Latham* came in he had a memorandum or paper relative to the very same matter witness and *Breen* and *Schmidt* were talking about; after some discussion between the parties, *Mr. Breen* asked, (does not recollect whom he addressed,) to whom the money should be paid ? But *Mr. Latham* answered, that it was customary to pay it in the office, or to the notary; witness does not think that *Mr. Schmidt* gave any answer; but he is not sure."

Whether we take the testimony of either the one or the other of these witnesses, no consent on the part of *Schmidt* that the money should be deposited with, or paid to the notary, is shown. The motive by which *Latham* was actuated to be so officious in his advice to pay to, or deposit it with, the notary, is not difficult to divine. No doubt the fatal "box," which was the receptacle of all the money belonging to persons transacting business in the notarial office, was nearly drained, and, in order to prevent exposure, it was indispensably necessary to replenish it. From *Latham's* own testimony it appears that he was a *particeps criminis* in the delinquencies of the notary; and although his culpable conduct may not be attributable to moral turpitude, but to weakness of character, yet the course pursued by him was the cause of the money being deposited with him. According to *Latham, Schmidt* said that it made no difference ; according to *French*, he said nothing in reply to *Breen's* inquiry. Under this state of facts it is submitted, that no such consent on the part of *Schmidt* to the deposit is established as to put the money deposited at his risk. Having no right to call on *Breen* for the payment of the price until the title was passed, *Schmidt* might well observe that it made no difference to him with whom *Breen* deposited his money. Should the court, however, be of opinion that the expression used by *Schmidt* would have produced a different effect, if the money had been actually deposited with or paid to the notary himself, still it is respectfully insisted that the implied agency conferred thereby on the notary does, at any rate, not extend to his clerk. A man may well have confidence in a public officer intrusted with the most delicate and important functions, but it does not follow that he is willing to place the same trust in all his clerks.

It was also contended in the court below, that *Schmidt* ratified the deposit of the money with the notary's clerk, by applying to him for it soon afterwards. This argument cannot prevail, because no ratification can fairly be inferred from the act; besides, the refusal to give him any part of the money, clearly shows that the deposit was not held for the benefit of *Schmidt*, and consequently not at his risk.

The last and only remaining ground on which the counsel for the plaintiff rely, is the supposed custom, established by the evidence, for the purchaser to pay or deposit the price, with the notary before whom the deed of sale is to be passed. On this point, on which alone the case was decided in the court below, I must be permitted to observe, that no such custom as the payment of the price to the notary has been proved ; and that, for the best of all reasons, because no such absurd custom has ever prevailed. As this is a question of fact, in relation to which I have the misfortune to differ from the opinion of the learned judge of the district court, it is incumbent on me to refer to all the evidence in the record on that head.

*Latham*, the unfaithful notary's clerk, who has already figured so conspicuously in this case, states, it is true, "it is customary with purchasers to pay the price of property in the notary's office ; he has been in notarial offices nearly fifteen years. Witness, as clerk of *Mr. Beard*, generally received the money paid in the office. It is not customary to pay the moneys to the vendors before signing the act."

*Theodore Guyol*, a notary public, testifies : "That he has been for the last four years a notary public; it is customary for purchasers of property to deposit the cash payment with the notary in whose office the act is to be passed." On the cross-examination, this witness states : "Witness deposits the money in bank so soon as he receives it; and has an account with the bank as notary. He would not suffer a vendor to exercise any control upon such money before signing the act."

This is all the testimony to be found in the record in support of the pretended custom to pay the price of property purchased to the notary who has been selected to pass the act of sale.

As regards the testimony of the first witness, *Latham*, it is only necessary to observe that he evidently does not understand the meaning of the word payment. Every payment pre-supposes a debt; and it follows as a carrollary, that no payment can be made to the notary, or into his office, as the price which constitutes the debt to be paid is not due to him or to his office.

*Guyol*, the other witness, who is an intelligent gentleman, understands the difference between a deposit and a payment. *Latham* says the price is first paid to the notary, or into his office, and afterwards to the vendor when the act is completed, which is nonsense; for as there is but one debt, there can be but one payment, in correct legal language. *Guyol*, on the contrary, states, that the price is deposited with the notary to be paid to the vendor, when it is really due to him on the completion of the title. This is intelligible and consistent.

No custom of paying the price to notaries is established by the evidence in the record. On the contrary, it is shown that purchasers are in the habit of intrusting their funds to the notary who is to pass the act of sale. This money, until it is paid to the vendor, belongs to the purchaser just as much as if he had deposited it to his credit in the State Bank; and as it is his property, it is at his risk, *res perit domino.* Any other doctrine is subversive of the most fundamental principles applicable to the subject.

Nor does it make any difference by whom the notary may have been selected. In the present case there is no evidence that the notary was chosen by *Schmidt.* It is true that in the auctioneer's advertisement the notary's name is stated; but this cannot fairly be considered as evidence of *Schmidt's* choice. From the relationship existing between the auctioneer and the notary, being that of father and son, there can be little doubt that the selection was made by the former. Be that, however, as it may, the fact of a notary being designated in an advertisement of an auction sale, does not constitute that notary the agent of the vendor to receive the payment of the price.

To conclude: Both the plaintiff and the defendant are innocent parties, one of whom must support the loss resulting from the embezzlement of an unfaithful depositary; but as the plaintiff put it in the power of the notary to make a fraudulent conversion of his money, he must, it appears to me, bear the loss.

The judgment of the court was pronounced by

EUSTIS, C. J. On the 9th February, 1850, the defendant caused to be sold at public auction, two lots of ground situated in the city of Lafayette, which were purchased by the plaintiff for fourteen hundred and thirty dollars, payable one-fourth cash and the balance in three equal installments, at six, twelve and eighteen months. In the auctioneer's advertisement it was stated that the deeds of sale were to be passed before *Joseph R. Beard*, then a notary public in New New Orleans. It appears that on the 27th February, 1850, the purchaser, *Breen*, deposited in the hands of one of the notary's clerks, the sum of three hundred and fifty-seven dollars and fifty cents, being the amount of the cash portion of the price of the property, and paid two dollars and fifty cents on account of fees. When this money was deposited no receipt was required; but afterwards the clerk gave the plaintiff the following acknowledgment:

"New Orleans, March 15, 1845.

"I have received from *Mr. John Breen* three hundred and fifty-seven dollars and fifty cents, for cash payment on property bought from *C. Schmidt*, and two dollars and fifty cents on account of fees, on the 27th February last.

"For J. R. BEARD, Notary Public,          W. G. LATHAM."

The true date is, no doubt, 1850 instead of 1845.

The clerk, who was examined as a witness, testifies that "the money was not handed to *Mr. Beard* personally, but was received in his office; it was used by *Mr. Beard's* orders." And in his cross-examination he says, "witness received the money; *Mr. Beard* was not in the office at the time witness

3

received the money; the money was used to pay off other liabilities of *Mr. Beard;* he cannot exactly say how long after it was received, but shortly after. It was not deposited in bank. All the money received was put in a box, and used as wanted."

The question which the case presents is, at whose risk was the money after it had been deposited with the notary's clerk?

The Judge of the Second District Court of New Orleans considered the money exclusively at the risk of the defendant, and, in the present suit, decreed him to be liable to pay the plaintiff the whole price, and the sum of sixty dollars damages and costs. From this judgment the defendant has appealed.

We concur with the counsel in the opinion that the delivery of the money to the notary's clerk did not constitute a payment. It could only constitute a deposit; and until the plaintiff was regularly put in default, it seems to us that the deposit was exclusively at the risk of the depositor. C. P. 407, *et seq.* Code 2163, *et seq.*

The notary's clerk to which the district judge, it appears, gave full credit, establishes a state of facts which take the case out of the general rule. We do not find his statements contradicted by the witnesses for the defendant.

*Latham* swears that he went to the plaintiff's store to get his title, and met the defendant there, and found him conversing with the plaintiff in relation to change in the terms of the sale, and in the course of the conversation *Breen* said to the defendant, "to whom shall I pay this money, to you or who?" Witness observed that it was customary to pay it in the office. *Schmidt* said it made no difference. After the money was paid in the office, *Schmidt,* the defendant, asked the witness to let him have part of it as he wanted to pay a note due on that day. *Breen,* at the time he deposited the money, signed the act prepared by the notary, and delivered his several notes according to the conditions of the sale. The only cause assigned for the non-completion of the act was the existence of a mortgage on the lots, which the defendant had neglected to remove.

The district judge came to the conclusion, that the defendant himself consented to consider the delivery of the money in the notary's office as a payment. The evidence is not of that character which would authorize this court to reverse this decision on a question of fact.

The judgment of the district court is therefore affirmed, with costs.