(41 South. 713.)

No. 15,662.

NOLAN v. LABATUT et al.

(Jan. 2, 1906.  On Rehearing, June 18, 1906.)

1. NOTARIES — MISCONDUCT — LIABILITIES ON BOND.

Where a notary represents that some one wants to borrow a certain sum of money, and that the act of mortgage to secure the loan will be passed before him, and that if the money is sent to him he will pass the act of mortgage and deliver the mortgage note to the lender, and the money is sent to him, and instead of a genuine mortgage note he delivers a note paraphed by him as notary for identification with an act of mortgage, but which is in fact nothing but a forgery, *held*, the notary, under these circumstances, owed the duty to the lender of the money to execute a genuine act of mortgage, and for his violation of that duty the surety on his bond is responsible.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Notaries, §§ 28, 31.]

2. SAME.

And the surety is in like manner responsible if the notary, instead of representing that the act of mortgage is to be passed by him, represented that it had already been passed by him, and supported the assertion by pointing to his official paraph on the note.  In such a case he would have given currency to the note by means of his official paraph.

Breaux, C. J., dissenting.

On Rehearing.

3. SAME—CONSTRUCTION OF BOND.

The notary in the parish of Orleans is required to give a bond in the sum of $10,000, "conditioned as the law directs for the faithful performance and discharge of his duties as notary public," and he and his surety are liable thereon, not only to those who employ him, but to any one who may sustain loss by reason of his failure, faithfully, to discharge his duties as notary, or by reason of his wrongful acts, committed by virtue, or by means, or under color, of his office.

4. SAME—DUTIES.

It is, however, no part of the duty of a notary to solicit or receive money for investment, and money intrusted to him for that purpose is not received in the discharge of the duties, or by virtue, or by means, or under color, of his office, and the surety on his official bond is not liable therefor.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Notaries, § 30.]

Land, J., dissenting.  Provosty, J., dissenting in part.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; George Henry Théard, Judge.

Action by Jennie Nolan against Henry P. Labatut and others.  Judgment for defendants, and plaintiff appeals.  Amended and affirmed.

Saunders & Gurley, for appellant.  Purnell Mitchell Milner, for appellee Fidelity & Deposit Co. of Maryland.

PROVOSTY, J.  This suit is on the bond of a notary who absconded.  The defense of the surety is that the acts, out of which the obligation sought to be enforced is alleged to have grown, were committed by the notary in his individual, not in his notarial, capacity, and that as a consequence the surety is not liable.  The defense is founded on the decision of this court in the case of Schmitt v. Drouet, 42 La. Ann. 1065, 8 South. 396, 21 Am. St. Rep. 408, the doctrine of which is expressed by the court as follows:

"Before a notary and his surety can be held, it is necessary to determine whether the act done or not done, committed or omitted, was or not authorized by law, was or not incumbent upon him, was or not required of him, whether he was directed to do it, whether he has failed to discharge the duty, and whether injury has been sustained.  It has hence been held that, where a notary does a thing which the law does not authorize him to do, although he does so, eo nomine, in his capacity of a notary public, the surety is not responsible."

That doctrine is inapplicable to the facts of this case, because the delinquencies charged against the notary in this case are with respect to acts done, or omitted to be done, in his official capacity.

Plaintiff seeks to recover the amounts of several notes which the absconded notary palmed off upon her as valid mortgage notes

identified with acts of mortgage passed before him, but which, with the exception perhaps of one, turned out to be forgeries. The notary had simply manufactured them, and, if he ever took the trouble to go through the form of executing acts of mortgage purporting to secure them, he never recorded the acts, and on absconding left no trace of them in his office. The one exception is the J. V. Olivieri note for $500. The evidence shows that there is a man by that name living in New Orleans, and that there is an act of mortgage purporting to secure this note duly recorded. As to this note, plaintiff will have to be nonsuited. The story of the others is as follows:

Plaintiff had some money which she was in the habit of investing in mortgage notes of small denominations. Those involved in this suit range from $250 to $675. The notary, H. P. Labatut, would let her know, usually by letter, that he had an investment for her, naming the amount, and request her to send him her check. She would either send the check, or take it to him in person. She would call for the mortgage note a day or two later, and he would hand it to her, laying stress upon his paraph of it as conclusive proof of its regularity, and she, trusting blindly to the efficacy of this paraph as a reliable criterion of genuineness, would accept the note.

But, perhaps, it were best to state the matter in some detail.

W. Westerhouse note, $550: The notary offered the investment to plaintiff, told her that he would pass the act of mortgage, and that it was not necessary for her to be present. Part of the money was already in the hands of the notary, and plaintiff left her check with him for the balance. When she called for the note he showed her his notarial paraph on it, as proof conclusive that the mortgage had been duly executed to secure it.

J. C. West note, $400: The notary wrote to plaintiff to send her check. She called at his office, and he told her he would examine the titles and pass the act of mortgage. When the note was delivered to her a few days later, she asked if it was perfectly correct, and he pointed to his paraph on the note as conclusive evidence.

D. J. Owens note, $650: The notary wrote to plaintiff he had an investment for her, and that he expected to close it the next day, and to send her check. Plaintiff, at the time appointed, carried her check and gave it in exchange for the note; the notary assuring her that he himself had passed the act of mortgage. The note was duly paraphed by him.

A. Harris note, $650: The notary wrote to plaintiff he had an investment for $650, which he expected to close during the week, and to send her check. When he delivered the note to her a few days later, he told her he had passed the act of mortgage, and called her attention to his notarial paraph on the note.

H. Howat note, $675: Plaintiff was unable to recall the circumstances of the acquisition of this note, but her check for same bears date May 22d, and the note itself May 24th, and on May 27th the notary wrote her:

"I have your investment of $675 duly executed, and have note for same."

Wm. Andrews note, $250: The notary manufactured this note, authenticating it by his official paraph, and gave it to plaintiff in part settlement for some money he had collected for her.

G. W. Kaupp note, $600: The notary wrote to plaintiff that he had a note for $600, secured by mortgage as per act passed by himself, and offered it to her as an investment.

As to all the notes, plaintiff testifies that what guided her in determining whether to purchase the notes or not was the notary's

paraph on them, and his statement that he had passed the acts of mortgage.

Thus it appears that, with the exception of the Andrews and Kaupp notes, which were already in existence at the time Labatut offered them to plaintiff, the circumstances were that the notary informed the plaintiff that some one wanted to borrow money, and that, if she would lend it, he would execute a mortgage to secure the loan; and that plaintiff furnished the money on the faith of the mortgage that was thus to be executed, she not appearing to the act of mortgage because the notary had represented to her, and rightly, that her doing so was not necessary. In other words, he was to execute a genuine mortgage to secure her loan, and he executed, instead, a forgery. It seems to us that these facts speak for themselves. If under these circumstances a notary were not to be responsible on his bond it would not be easy to conceive under what circumstances he would be.

The Kaupp and Andrews notes were already in existence when the investment was offered to plaintiff, and therefore, as to them, the notary did not undertake to execute an act of mortgage to secure plaintiff, but simply represented that the mortgage was already in existence. The transaction was simply a purchase of the note. But it was in his official capacity that Labatut represented to plaintiff that he himself had passed the act, and it was to his official paraph he pointed, and to which she trusted, and it was by the use of his office that he created the paper in exchange for which plaintiff parted with her money. In the case of the other notes he said:

"Give your money, and I will pass an act of mortgage to secure it."

In the case of the Kaupp and Andrews notes he said:

"Give your money, I have passed an act of mortgage, and here is the note secured by it."

Defendant's learned counsel argues very plausibly that if Labatut had made no pretense of investing the money, but after receiving it from plaintiff for the purpose of turning it over to the borrower had put it in his pocket and refused to return it, or had flatly told plaintiff that he was going to deliver a forged note to her, the surety on his bond would clearly not have been responsible; because it is no part of the official functions of a notary to receive money for the purpose of investment. True, under those circumstances, the surety would not be responsible, and for the reason stated; but those are not the circumstances of this case. For all we know, until the sham ceremony of the delivery of the note had been gone through with, the money was as safe in the hands of Labatut as it would have been in bank. He would have paid it over on demand as readily as the cashier of the bank would have done. The fact is that the real parting with the money was not the placing of it in the hands of Labatut, but it was the accepting of the forged note. Labatut at times had moneys for plaintiff, and plaintiff never considered that the money had gone away from her because it was in his hands. He invested some of this money in good notes for her. This court cannot decide this case on the hypothesis that Labatut refused to return the money, or that he flatly declared that he was delivering a forged note. What would have happened if he had done anything of that kind this court does not need to stop to inquire. The court is satisfied from the circumstances of this case that there was no probability of his doing anything of that kind. Hence the case must stand on the fact that by the use of his office he obtained such a hold on plaintiff's money as brought about her loss, and the surety must therefore answer for it. Plaintiff parted definitively with her money on the faith of his apparently official acts.

The Westerhaus note was on a printed

form having in the upper left corner the words: "H. P. Labatut, Notary Public, New Orleans." It bore on its face the following paraph: "Ne Varietur. Secured by mortgage by act passed before me this day. New Orleans, Oct. 27th, 1900." On delivering it to plaintiff, Labatut called her attention to the paraph as a proof of regularity and genuineness. But plaintiff, and probably he himself, did not notice that the paraph was not signed. In that respect it was incomplete. Defendant's learned counsel relies upon the absence of the signature as a fact differentiating this note from the others. We fail to see the difference. The note purported to be a complete note and was delivered by the notary as such.

The learned counsel for defendant insists that plaintiff confided her money to the notary as her agent for him to invest it for her, and that his act in investing it in forged notes was the act of a mere agent, not of a notary. But it is perfectly plain, under the facts, that Labatut dealt with plaintiff in the two capacites of agent and notary, and that, whatever he may have done for her as agent, it was clearly and distinctly as notary that he represented that he had executed the acts of mortgage and paraphed the notes. Nothing shows that as agent he was unfaithful to his trust. On the contrary, he seems to have rendered her as agent a full, complete, and satisfactory account. It was as notary, and by means of the paraphernalia of his office—his printed letter heads, his printed forms of notes, his paraph, and his acts of mortgage in buckram—that he swindled her; and, we repeat, the surety on his official bond must answer. Repeatedly Labatut told plaintiff when delivering the notes to her that his bond would stand responsible for their genuineness and regularity, and she acted on that representation.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed in so far as it condemns Henry P. Labatut, and be set aside in so far as it is in favor of the surety company, and that there now be judgment in favor of the plaintiff, Miss Jennie Nolan, and against the defendant the Fidelity & Deposit Company of Maryland, for the sum of $3,775, with 5 per cent. per annum interest from the 20th day of January, 1903; same being for all the notes sued on except that of J. V. Oliveri, for $500, as to which the suit of plaintiff is dismissed as in case of nonsuit. Defendants to pay the costs of the lower court, and the Fidelity & Deposit Company of Maryland to pay the costs of this appeal.

BREAUX, C. J., dissents.

### On Rehearing.

MONROE, J. The cause of action in this case is set forth, substantially, as follows:

That the defendant Labatut is a notary public, and that the defendant the Fidelity & Deposit Company of Maryland is the surety on his official bond:

"That, at various and sundry times, * * * petitioner employed the said Labatut, as a notary, to procure the execution of acts of mortgage on real estate and notes secured thereby which petitioner desired to purchase *as a means of investing her money;* that said Labatut would inform petitioner when persons would come to him desiring to obtain loans on the security of mortgages of real estate in this city; and that (petitioner) would instruct the said Labatut to procure the execution of the act of mortgage offered and of the note secured thereby, and would give him the money to pay the exact amount of the said note to which the mortgagee, under the contract of mortgage, would be entitled, except in one or two cases, where the said Labatut had some money which he had collected for petitioner, and, in those cases, the petitioner added the money required to cover the difference between what the said Labatut had and the exact amount required to pay for the note, and the said Labatut would bring to petitioner the said notes duly paraphed by him and purporting to be secured by mortgage or vendor's privilege on real estate in this city, and petitioner accepted said notes on the faith of said paraph, believing the said notes were, in fact, secured by mortgage and vendor's privilege, as stated by said paraph, and as she had instructed that they should be secured. Now your petitioner shows that, in a number

of instances, to be given hereafter, said notes were mere forgeries and were not secured by an act of mortgage or vendor's privilege, and that the paraph on the face of said notes, purporting to show that they were so secured, was false, and that petitioner was misled by said paraph and by the statements of said Labatut and lost the money which was paid for the said notes in consequence. Your petitioner shows that the *said Labatut violated the duties which he owed as notary to your petitioner, to procure genuine and valid acts of mortgage and notes secured thereby,* and that he deceived and defrauded your petitioner by affixing his official paraph as a notary on the face of the notes declaring that the same were secured by mortgage or vendor's privilege, when, in fact, they were not so secured, and that, for the said acts. both the said notary and the said surety are liable, in solido, to your petitioner for the money so paid out by petitioner in the purchase of the said forged notes bearing the false paraph and certificate of the said Labatut, as above stated. Your petitioner further shows that, in purchasing mortgage notes, secured by the acts of mortgage before a notary in this city, it is customary for the lender to deliver the money or check purchasing the mortgage note to the notary to deliver to the mortgagor, and that, in that way, petitioner paid for all the notes hereinafter described, of the aggregate value of $4,275, all of which petitioner took and paid for in reliance upon the paraph of the said notary on the face of the said notes. This paraph is customarily and invariably affixed upon the face of the notes secured by mortgage in this city by the notary before whom the act of mortgage is passed, and is universally relied upon as showing that the said note is secured by mortgage. Petitioner shows that the notes so purchased by her were as follows, to wit: [Here follows a descriptive list of the eight notes.] Petitioner shows that the said Labatut is insolvent and unable to pay anything on the said notes; that all of his acts and doings in the premises were fraudulent, and were violative of his duty as a notary and of the duties which he owed to petitioner, *who had employed him, as a notary, to procure the acts of mortgage and the notes secured thereby* as above mentioned; and that, for his said violation of his duties as notary, the said Labatut and the said surety on his official bond as notary are liable, in solido, to your petitioner for the amount of money that she has lost in the purchase of the said notes." (Italics by the court.)

The Fidelity & Deposit Company, for answer—

"Denies that plaintiff's transactions with said Henry P. Labatut were in his notarial capacity or in the performance of any of the duties required of him by law, but avers, on the contrary, that said Henry P. Labatut was, for a long time, the trusted agent of the plaintiff for the investment of funds for her, and, at times, had and retained money belonging to her for investment, and also had the key to her bank box. Respondent denies that the plaintiff was misled by the paraph on the notes referred to, and avers, on the contrary, that she deposited funds with the said Labatut or paid said Labatut money with which to buy said notes referred to, and relied on his individual honesty and integrity, and that if she sustained any loss it was through embezzlement of those funds," etc.

It appears from the evidence that Labatut would write to the plaintiff that he had in view an investment in mortgage paper, and that she would send him, or take him, her check, and, some days later, get from him what purported to be a mortgage note. Labatut, however, collected (or professed to collect), for her, the notes and interest on the notes, in which her money was thus invested, and, at times, would render her statements showing the reinvestment, in other paper, of moneys collected for her account, and, for these services, or for such services as he might be considered to have rendered, he, now and then, with the consent of the plaintiff, deducted small sums from the balances in his hands. In regard to the note of W. Westerhouse, for $550, plaintiff testifies that she received a communication, as above described, in response to which she gave Labatut her check, dated October 25, 1900, for $328 (which check was paid to Labatut on the day of its date). The remaining amount necessary for the purposes of the promised investment was to have been taken from a balance, which Labatut already had in his hands, resulting from collections which he had made for plaintiff's account; but at what time those collections were made does not appear. Some time after the check had been delivered and cashed, plaintiff received from Labatut what purported to be the note of W. Westerhouse, for $550, payable to his order and by him indorsed and bearing, also, an inscription in the following terms, to wit: "Paraph: Ne Varietur. Secured by mortgage—by act passed before me this day. New Orleans Oct. 27, 1900." This inscription, as may be ob-

served, does not bear the signature of the notary.

We produce, in this connection, part of plaintiff's examination as a witness:

"Q. I ask you if you don't admit that you handed Mr. Labatut this check for $328 prior to being shown any note or act of mortgage? A. Yes, sir; but he said it was pending; that he was examining the title. * * * Q. Haven't you been investing your money in that way for seven or eight years? A. Yes, sir. Q. Then, in this purchase of this Westerhouse note, if you say you relied on the paraph, why is it you accepted the note when no paraph was there? A. Well, I knew that was his writing, and I knew he was the notary that had executed that. * * * It is paraphed, but not signed. I knew he had done it, and gave it to him, but, in fact, it was an oversight. I didn't notice it until after he was gone. Q. Now, on this Westerhouse note, the only amount of money which you gave Mr. Labatut was $328, isn't that a fact, because he had for your account the balance of the money? A. Yes, sir. Q. How long had he had the balance of the money? A. I couldn't say. I would have to refer to my notes and find out. I suppose I could hunt it up. * * * Q. And he never accounted to you for that $269 other than by what you say—the delivery of this note? A. I gave him permission to do that, with my check and the amount he had for me to buy the mortgage note."

The story of the J. C. West note, for $400, is told as follows:

"New Orleans, La., Oct. 28, 1901.

"Miss Jennie Nolan—Dear Miss: I have a safe investment for $400 for which you can send me your check. I had another application for a much larger amount, but, as you have not the amount, give you privilege of this one. When you call, on Monday following, All Saints' Day—when I hope to have the Howat note settled—we can see what may be done with that amount. The investment I offer may not be closed for a couple of days, but wish to be in position to accommodate when he calls. Trusting that you are well, I beg to remain,

"Sincerely,        [Signed]  H. P. Labatut."

In reply to this communication, plaintiff gave Labatut her check, of even date therewith, for $400, and on November 5th, following, or, possibly, later than that, he gave her what purported to be the note of J. C. West, for that amount, secured by mortgage, being one of the notes sued on in this case.

Concerning the Owen note, for $650, of date January 10, 1902, plaintiff gives this, with other, testimony:

"Q. Now, I find that, on January 9th, Mr. Labatut wrote you a note stating that he had collected the Janson note for you and had another investment for $650, and I find that, on January 9th, you gave your check to him for $611. Do you recollect whether you came to the office with your check or with his letter on that date or sent this? A. Whether I sent the check? Q. Yes. A. I don't know. I think I sent one check. I don't know now which one it is. Q. You have no positive recollection of this? A. I have no positive recollection as to whether that is the one I sent—that check; that is the check I sent him, I sent him that check. Q. Then, at that time that you sent it to him, you were not exhibited any notarial act in connection with this investment, were you? In other words, if you sent the check on January 9th, you never saw any notarial act exhibited to you by him? A. Well, I went down later and got my note. Q. What note is that? By Counsel: The Owens note. A. I didn't see anything for the Owens. I think he didn't read the act of mortgage to me. Q. So, then, in this particular case, you handed Mr. Labatut $611, without, contemporaneously, receiving any note or being shown any act of mortgage? A. I didn't give him any money. Q. I mean handed him the check? A. I sent him the check, and he examined the title and passed the act of mortgage, and I got my mortgage note when I called, and he showed me the paraph on the note as security."

Concerning the Harris note, for $650, dated April 4, 1902, plaintiff received a communication from Labatut reading as follows:

"Henry P. Labatut, Notary Public. Hennen Building. Mortgage Loans Negotiated.

"Miss Jennie Nolan—Dear Miss: Having an investment of $650, which I submit you, I would be pleased if you would hand bearer check for same. I expect to close the matter during this week and suggest that you call on Saturday morning, about 10 a. m., so that the note can be placed in your box. If this is not convenient you can call at your convenience. I trust that you are well, and with best wishes, beg to remain

"Yours sincerely,  [Signed] H. P. Labatut."

Plaintiff says that she sent the check as requested (and the check, which is in evidence, bears date April 2, 1902, whilst the note bears date April 4, 1902), and that she saw no note or mortgage until later when she obtained the note by going to the office for it. Plaintiff's check for $675, given for the Howat note, bears date May 22,

1902. The note is dated May 24, 1902, and there is in the record a communication from Labatut, of date May 27th, in which he says:

"I have your investment for $675 duly executed, and have note for same. I will wish you to call tomorrow by 9 or 10 a. m., so that I can place same in box and also withdraw note of Miss Ducros, for $75, secured by gas stock which must be transferred to the new company assuming the same. I will explain same to you."

Speaking of the Andrews note for $250, dated September 19, 1901, plaintiff says:

"Q. How did you pay for the note? A. With the money that he had for my account. Q. In other words, then, Mr. Labatut bought this note for you of William Andrews out of money received by him for your account on payments of other notes held by you? A. Yes."

Concerning the Kaupp note for $600, dated November 15, 1899, there appears in the record a communication from Labatut to the plaintiff of date March 19, 1900, in which he says:

"I have a note for $600 dated November 15, 1899, payable two years after date, with 7 per cent. interest, drawn by G. W. Kaupp, secured by mortgage on good real estate. The note is now worth $614 being int. accrued for 4 months. If agreeable to you, you can send me your check for the amount and I will retain the note for your account. The act of sale by which the note is secured was made by me. Trusting that you are well,
"Sincerely,      [Signed]   H. P. Labatut."

Plaintiff testifies that she bought the note in question, but was unable to say at what time she had given her check for the price.

It may be here remarked that the checks by which plaintiff parted with her money were made payable to the order of Henry P. Labatut; that the communications upon the faith of which the checks were given all bore that signature; and that the accounts which were furnished by Labatut, from time to time, were signed in the same way and without the addition of his official character. Thus, he, at one time, probably in September, 1901, rendered an account reading as follows:

H. P. Labatut in Account with Miss Jennie Nolan.

| | | |
|---|---|---|
| By note of J. Faibvre & int........ | | $510 85 |
| By note of J. A. Weinans and int.... | | 206 00 |
| By interest, note of Mrs. Korndorffer ........................... | | 48 00 |
| Total credit .................. | | $764 85 |
| To purchase note of Mrs. Edw. Durrive, $500 less 6 per cent. | $470 00 | |
| To city taxes 1904.......... | 33 00 | 503 00 |
| Balance .................... | | $261 85 |
| E. & O. E. Note of Wm. Andrews ($250) ........................ | | 235 00 |
| [Signed]   H. P. Labatut...... | | $ 26 85 |

So that, it was merely by crediting this account, and not by parting with her money, at the time, that plaintiff acquired the Andrews note.

### Opinion.

The question here presented for decision is one of considerable importance to the public at large, who are interested in knowing upon what basis their transactions with notaries public rest; to the notaries, since those of them who are content to confine themselves to the discharge of the functions which the law assigns to the notarial office are interested in not being charged a commission, in order to obtain the bonds which they are required to give, which will be out of proportion to the risk; and to the sureties on the bonds, who are interested in not being held liable beyond their contracts.

Act No. 42, p. 34, of 1890 (amended and reenacted by Acts No. 138, p. 217, of 1896, and Act No. 187, p. 367, of 1902), provides that a notary public in the parish of Orleans shall give bond in the sum of $10,000, "conditioned as the law directs, for the faithful performance and discharge of his duties as notary public." If therefore there was, at any time, a question as to whether (considering Rev. St. § 2503, and Act No. 40, p. 53, of 1886) the obligation of his bond should not be confined to those by whom he may have been employed, that question no longer exists, and

the bond, required not to be subscribed in favor of the Governor of the state (Act No. 187, p. 367, of 1902), inures to benefit of any one who may sustain loss by reason of the failure of the notary faithfully to perform and discharge his duties as notary public, or, by reason of his wrongful acts, committed by virtue, or under color, or by means, of his office. Rochereau v. Jones, 29 La. Ann. 82; Schmitt et al. v. Wid. O. Drouet, 42 La. Ann. 1064, 8 South. 396, 21 Am. St. Rep. 408; Weintz et al. v. Kramer et al., 44 La. Ann. 35, 10 South. 416. It would be tedious and useless to undertake to enumerate the acts which a notary may legally do, or which he may do, by virtue. or color, or means of his office. This court has said:

"A notary is defined to be an officer whose duty it is to attest the genuineness of any deeds or writings in order to render them available as evidence of the facts therein contained. Abbott's Digest, vol. 2, p. 182, v. 'Notary.' Also, a notary is a public functionary, authorized to receive all acts and contracts to which parties wish to give the character of authenticity, attached to the act of public authority, to secure their date, their preservation and the delivery of copies. Dict. Droit Civil, vol. 5, p. 27, v. 'Notaire.' "

Although section 2492, Rev. St., provides that notaries public shall "have certain powers. it does not undertake to enumerate them all. It does not mention, for instance, that of receiving the renunciation of married women of their rights over the property of their husbands; the duty imposed upon notaries to attend to the registry of acts of sale in the conveyance book of the proper office; to paraph notes secured by privileges or mortgage with acts before them, Rev. Civ. Code, art. 3384, and various other acts authorized by law." Schmitt et al. v. Widow O. Drouet et al., supra.

As suggested in the foregoing excerpt, the duty is expressly imposed, by Rev. Civ. Code, art. 3384, upon "every notary before whom an act shall have been passed, by which notes to order have been given for the payment of a debt bearing a privilege or mortgage, of attesting each of the notes by putting his name on it," mentioning the date of the act from which the privilege or "mortgage is derived, under penalty of damages." But, although notaries are authorized to prepare, and to authenticate, and to record, acts of sale and of mortgage, and, although they are required, under penalty, to paraph notes, to order, given in connection with such acts and secured by privilege or mortgage, they are neither authorized nor required to receive, or to act as the custodians of, any money which is to pass between the parties to those acts. In the case of a sale, the cash portion of the price goes from the vendee to the vendor, and, in the case of a mortgage, the money goes from the mortgagee to the mortgagor, unless, in either case, the parties, by agreement, constitute the notary their agent or depository, in which event he acts as an individual and not in the discharge of any duty of his office. More than 50 years ago, Mr. Roselius, in arguing the question before our predecessors, said:

"The functions and authority of a notary public are defined by law, and, surely, no one ever supposed that the public officer whose duty it is to draw up, in the form and with the solemnities pointed out by law, a deed or authentic evidence of a contract of sale, was authorized to receive the price, and that such payment discharged the purchaser. * * * Now, as the notary is not the mandatory of the vendor for whom he draws up and passes a deed of sale, it would seem to follow, as a necessary consequence, that the purchaser cannot make a valid payment of the price to him."

And Eustis, C. J., as the organ of the court, said:

"We concur with the counsel in the opinion that the delivery of the money to the notary's clerk did not constitute a payment."

The case was decided in favor of the plaintiff, on the ground that he had consented that the money should be deposited with the notary. Breen v. Schmidt, 6 La. Ann. 13. In the following year, a similar case was presented, against the same defendant, and Rost, J., as the organ of the court, said:

"This case differs from that of Breen against the same defendant (6 La. Ann. 13), in this, that it is not shown that, as in that case, the defendant had authorized the plaintiff to deposit with the unfaithful notary the cash portion of the price, etc. The notary having absconded without accounting for the amount deposited, we are of opinion that the plaintiff must bear the loss." Brown v. Schmidt, 7 La. Ann. 349.

And the doctrine thus applied was affirmed in the Succession of O'Keefe, 12 La. Ann. 246. In a case where suit was brought against a notary and his sureties for the recovery of money which had been deposited with the notary to enable him to cancel certain mortgages, it was said:

"The securities of a notary public are only liable on its failure to discharge the duties of his office. The law has not made it the official duty of a notary to receive money to erase mortgages." Lescouzeve & Abry v. Ducatel et al., 18 La. Ann. 470.

In another case, where the purchaser of a slave, which, as it turned out, the vendor was unable to deliver, deposited the price with the notary by whom the act of sale had been prepared, and sued the notary and his surety for its recovery, it was held:

"There is no authority given by law to a notary, when parties intend to pass acts of sale before him, for him to receive moneys or checks from one party to deliver to the other. Such an act forms no part of his duty as a notary. The security which he gives for the faithful performance of his duties as a notary is only bound for such acts of his as the law authorizes or requires him to do in his official capacity." Monrose v. Brocard et al., 20 La. Ann. 78.

There is no doubt that the paraphing (i. e., the writing thereon by the notary of his signature, with mention of the date of the act with which it is connected) of a mortgage note is a notarial function, for the nondischarge, or improper discharge, of which the notary and his sureties may be held liable to any one who may thereby be injured. Hence, if the plaintiff had purchased (whether from the notary, himself, or from any one else) the forged and paraphed notes here sued on, believing them to be what they purport to be, she would be entitled to recover. But, our reconsideration of the case has lead us to the conclusion that, save in the case of the Kaupp note, she had parted with her money, not only before the notes had been paraphed, but before they had come into existence (the Westerhouse note, it may be remarked, is not, and never has been, paraphed), and, in two instances, at least, the forged notes sued on were given and received in discharge, or partial discharge, of Labatut's indebtedness, as agent, for moneys which he had previously collected for plaintiff's account. The legal situation is therefore correctly stated in the following excerpt from the opinion in a case, closely resembling this, in which, as in this case, the defendant, who was a notary, had, for several years, been receiving money from the plaintiff for investment, and of accounting for the same by remitting to the plaintiff forged notes and pretended deeds of trust with false certificates of acknowledgment, to wit:

"It thus appears from the relator's own evidence that he never parted with any value on the faith of Boughton's official acts. Boughton, as the relator's agent, sent to him a number of forged notes and forged and fraudulently acknowledged deeds of trust, and, on the faith thereof, obtained certain credits on his account with relator. It is difficult to see on what theory any liability on Boughton's official bond is to be enforced under the circumstances. * * * As, under the admitted facts of the case, the damages are the result solely of the criminal conduct of plaintiff's own agent, in embezzling plaintiff's funds, the mere fact that said agent happened to be a notary cannot give the plaintiff a cause of action on the bond. The false certificates of acknowledgment are, in fact, wholly extraneous matter." Mathews v. Boughton, 58 Mo. App. 155.

In the case at bar, the defendant Labatut appears to have solicited the plaintiff to deposit her money in his hands for investment, and she seems to have yielded to his solicitations upon his assurances (over his individual signature as it happens, though it would have been the same if he had signed as notary) that he would, at some time in the near future, furnish the securities in which

the money was to be invested. But, if he had borrowed the money for his individual account upon such assurances, and had afterwards made the assurances good by forgeries, committed as a notary, it would hardly be contended that the plaintiff sustained no loss until the forgeries were committed, and we think that there is no difference, in that respect, between the case of a notary who obtains money as a loan to himself and the case of one who obtains it for the purpose of investing it for the owner, and that, in either case, if the money is not accounted for, the owner must be considered to have lost it when he parted with it rather than when, at a later date, a forgery is committed by way of accounting. In the matter of the Kaupp note, the evidence, we think, justifies the conclusion that the note was actually in existence, in due form and having all the appearance of a genuine instrument, when the attention of the plaintiff was first called to it, and that she parted with her money on the faith of what Labatut, as a notary, had actually done, and not upon the faith of that which, as an individual, he promised to do as a notary, and, in that respect, the matter differs from that of the Andrews note, which Labatut delivered to the plaintiff by way of accounting for moneys which he had previously received from her and had embezzled. Plaintiff's counsel insist that the view which we now take of the case is at variance with that expressed in the case of Stork v. Am. Surety Co., 109 La. Ann. 713, 33 South. 742. The difference, however, lies in the facts and not in our views upon the questions of law. It was said in the case mentioned, referring to the notary's bond there sued on:

"The bond was given for the faithful performance of the duties of his office. The liability, none the less, has been restricted as security, to the faithful performance of such acts as the law authorizes or requires him to do, in his official capacity"—citing Monrose v. Brocard, 20 La. Ann. 78.

117 LA.—15

And the court then proceeds to hold that it was within the official duties of the notary to receive mortgage notes for the cancellation of the mortgages by which they were secured, and that his sureties were liable for their diversion. The facts being different, we do not find it necessary, for the purposes of the case at bar, to review the reasoning which lead to that conclusion.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be avoided and amended, in so far as it rejects entirely the demand of the plaintiff against the defendant the Fidelity & Deposit Company of Maryland, and that plaintiff now have judgment against said company, in solido, with the defendant Henry P. Labatut, in the sum of $600, with legal interest thereon from judicial demand, and costs, and in all other respects that said judgment be affirmed.

It is further adjudged and decreed that, as between plaintiff and defendants, the defendants be condemned, in solido, for the costs of the appeal, and that, as between the two defendants, the costs be borne by defendant Henry P. Labatut.

LAND, J., dissents. PROVOSTY, J., dissents in part, adhering to the original opinion.